AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

| | |
|---|---|
| United States of America<br>v.<br><br>DARIUS RODNEY CAPERS<br><br><br><br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.

6:23-mj-**1027-DCI**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____October 4, 2022_____ in the county of _____Orange_____ in the _____Middle_____ District of _____Florida_____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 2114(a) and (b) | Robbery of a Mail Carrier.  Receipt or possession of stolen USPS property. |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
*Complainant's signature*

CHARLES JOHNSTEN, U.S. Postal Inspector
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____1/10/2023_____

City and state: _____Orlando, Florida_____

DANIEL C. IRICK
UNITED STATES MAGISTRATE JUDGE

| | | |
|---|---|---|
| **STATE OF FLORIDA** | **CASE NOS.** | **5:23-mj-1001-DCI** |
| | | **5:23-mj-1002-DCI** |
| **COUNTY OF ORANGE** | | **5:23-mj-1003-DCI** |
| | | **6:23-mj-** 1027-DCI |

## MASTER AFFIDAVIT IN SUPPORT OF
## THREE SEARCH WARRANTS AND ONE COMPLAINT

I, Charles Johnsten, being duly sworn, state as follows:

**I.     INTRODUCTION AND AGENT BACKGROUND**

1.     I make this master affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for warrants to search each of the following things, places, or locations:

a.     the premises known as 5017 SW 97th Place, Ocala, Florida ("SUBJECT PREMISES"), further described in Attachment A1, for the things described in Attachment B1;

b.     a 2015 Grey Jeep Grand Cherokee, VIN 1C4RJEAG3FC826300 ("TARGET VEHICLE"), further described in Attachment A2, for the things described in Attachment B2;

c.     a cellular telephone, assigned telephone number 352-812-5772 ("TARGET TELEPHONE"), further described in Attachment A3, and the extraction from that property of electronically stored information described in Attachment B3.

2.     I further submit this master affidavit in support of the issuance of a complaint and arrest warrant for Darius Rodney Capers ("CAPERS"), for violations of 18 U.S.C. § 2114(a) (Robbery of a Mail Carrier) and 18 U.S.C. § 2114(b) (Receiving or Possessing stolen USPS property).

3.     I am a Postal Inspector with the United States Postal Service (USPS) and have been so employed since December 2016. I am currently assigned to the Orlando, Florida, Domicile. Prior to December 2016, I was a Special Agent with the United States Secret Service for nine years, assigned to the Orlando Field Office. Among my duties as a Postal Inspector, I investigate financial crimes, including identity fraud, mail theft, mail fraud, bank fraud, wire fraud, and the use of counterfeit and fraudulent access devices, such as credit cards, debit cards, and gift cards. I also investigate burglaries of USPS property and Robberies of USPS employees.

4.     The information in this affidavit is based upon my personal knowledge, information obtained from other law enforcement personnel, information obtained from corporate investigators, and information obtained from financial and other banking institutions.

5.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrants and complaint and does not set forth all of my knowledge about this matter.

## II.   PROBABLE CAUSE

### October 4, 2022, Robbery of a USPS Mail Carrier

7.      On October 4, 2022, the United States Postal Inspection Service (USPIS) was notified that at approximately 3:04 pm a USPS mail carrier ("Victim 1") had just been robbed in front of a neighborhood mailbox located at 911 North Nowell Street in Orlando, Florida. Victim 1 was on duty in his USPS issued uniform delivering mail on North Nowell Street.

8.      Victim 1 was interviewed by law enforcement and stated that as he exited his USPS mail truck and opened the neighborhood mailbox, a male (the "Robber") approached Victim 1 and told him that he wanted his key. The Robber was described as a black male in his late teens to early twenties, approximately 5'11", skinny build, light-skinned, with a light grey or white hoodie, white gaiter style mask across his face, and grey sweatpants. Victim 1 told the suspect "Sure" and laughed, believing that the Robber was joking. The Robber told Victim 1 to give him the key and Victim 1 said, "Sure, you can have the key," still thinking the Robber was joking. The Robber told Victim 1 he was serious, held his hands near the front pocket of his hoodie, and shook the pocket up and down. Victim 1 believed the Robber had a

weapon. The Robber again demanded the key, which Victim 1 understood to be his USPS issued arrow key.[1]

9.      Victim 1 asked the Robber, "Are you serious?" and the Robber replied, "Yes, keep your voice down." The Robber told Victim 1 he wanted all the keys and to give him the whole key chain. Victim 1 handed the arrow key and arrow key chain to the Robber who then turned around and ran south on North Nowell Street.

10.     Law Enforcement obtained video surveillance footage ("Surveillance Video 1") from a nearby resident. Surveillance Video 1 captured images from the robbery, as depicted below:



---

[1] Arrow keys are USPS proprietary keys that are serialized. They grant access to various mail collection receptacles, usually for specific zip codes that make up a geographic area. No person outside of the USPS is authorized to be in possession of an arrow key.

11.     Below is a picture of an USPS arrow key, much like the arrow key that was stolen during the robbery (the "Stolen Arrow Key").[2]



12.     On the day of the robbery, law enforcement obtained additional video surveillance ("Surveillance Video 2") from a nearby business. The video depicts the Robber in the passenger seat of the TARGET VEHICLE heading south on Paul Street in Orlando, FL approaching Colonial Dr.



---

[2] While the picture does not show the *actual* Stolen Arrow Key, the picture provides a visual example of an arrow key similar in appearance to the Stolen Arrow Key.

13.     The Orange County Sheriff's Office AIM (Analytics Intelligence
and Monitoring) unit was able to observe the TARGET VEHICLE approach
the intersection at Colonial Dr. and Paul St. and turn westbound on Colonial
Dr. The vehicle then arrived at the intersection of Colonial Dr. and Hiawassee
Rd. where it turned south on Hiawassee Rd., towards the 408 Toll Road at
3:08 pm. The Central Florida Expressway Authority obtained footage of the
TARGET VEHICLE traveling westbound through the Hiawassee Mainline
Toll Plaza. During that time, the TARGET VEHICLE passed through the
plaza at 3:09 pm, displaying Florida License Plate of 30DANV, with the
Robber inside the vehicle. Law Enforcement discovered the registered owner
of that TARGET VEHICLE is (R.C.) who resides at the SUBJECT
PREMISES and as discussed below is the father of CAPERS.

14.     Law Enforcement later entered the license plate of the TARGET
VEHICLE into a LPR (License Plate Reader) program and discovered that
the TARGET VEHICLE was captured on a LPR camera at Pine Hills Rd.
and Colonial Dr. (Orlando, FL) on the day of the robbery (October 04, 2022)
at 2:42pm. According to Google Maps, Pine Hills Rd. and Colonial Dr. is
approximately 4.7 miles away from the scene of the robbery.

15.     On October 4, 2022, at 7:28pm (the day of the robbery), the
TARGET VEHICLE was captured on another LPR camera at Southwest

Highway 484 & SW 95th Circle in Ocala, FL. According to Google Maps,

Southwest Highway 484 & SW 95th Circle is approximately 6.8 miles away

from the SUBJECT PREMISES.

October 6, 2022, Robbery of a USPS Mail Carrier

16.     On October 6, 2022, the USPIS was notified at approximately

4:08 pm that a USPS mail carrier ( "Victim 2") had just been robbed in the

parking lot at Grace Alive Church, located at 1400 North Nowell Street,

Orlando, FL. The robbery occurred at approximately 4:00 pm. Victim 2 was

on duty in his USPS issued uniform delivering mail in the area.

17.     Upon returning to his USPS vehicle from delivering mail in the

nearby community, Victim 2 observed the Robber sitting in the crouch

position in the northeast corner of the church parking lot. Victim 2 described

the Robber as being in his late teens, approximately 5'6" to 5'7", slim build,

and medium-skinned, with a black hoodie, red plaid pajama pants, and

wearing a white medical style mask across his face. Victim 2 explained that as

he was grabbing mail from his Postal vehicle on the driver's side, the Robber

walked up to him and ordered him to give up the arrow key. Victim 2 noticed

a black firearm in the Robber's right waistband.

18.     Victim 2 states that he took his truck vehicle key off the key

chain, and the Robber told him to "hurry up, there are kids around, I don't

7

want to hurt any kids." As a result of the Robber's statement, Victim 2 began to hurry. After Victim 2 took his USPS mail truck vehicle key from the keychain, he handed the Robber the arrow key.

19.     Victim 2 stated the Robber walked across Nowell Street and got into the front passenger side of the TARGET VEHICLE that was parked at the Intersection of Avery Street and Nowell Street. The TARGET VEHICLE was witnessed driving away southbound on Nowell Street.

20.     Law Enforcement contacted a nearby resident, that provided a picture of the surveillance video ("Surveillance Video 3") of the TARGET VEHICLE, as depicted below:



21.     Law Enforcement later entered the license plate number

(30DANV) of the TARGET VEHICLE from the previous robbery into the

same LPR program and discovered the TARGET VEHICLE was captured at

Pine Hills Rd. and Colonial Dr. in Orlando, FL and at Hiawassee Rd. and

Silver Star Rd. in Orlando, FL, prior to the robbery on October 06, 2022.

Hiawassee Rd. and Silver Star Rd. is approximately 2.1 miles away from the

scene of the robbery.

22.     After that robbery, the TARGET VEHICLE and license plate

was captured on another LPR camera at Highway 484 and Marion Oaks Blvd.

in Ocala, FL. Law Enforcement discovered that Highway 484 and Marion

Oaks Blvd is approximately 5.2 miles away from the SUBJECT PREMISES.

<u>October 25, 2022, Robbery of a USPS Mail Carrier</u>

23.     On October 25, 2022, the USPIS was notified that at

approximately 12:55 pm a USPS mail carrier ("Victim 3") had just been

robbed at the Andover Place at Cross Creek Apartments, located at 10328

Venitia Real Ave, Tampa, FL 33647.

24.     While Victim 3 was delivering mail, she was approached by the

Robber telling her to give him "that key." Victim 3 described the Robber as

having a darker complexion and probably a black male, approximately 18

years old to mid-20s, approximately 6' tall, thin, and wearing a black face

mask with only the eyes cut out. Victim 3 stated the Robber was wearing a light gray zip-up hoodie pulled over his head, black pants, black sneakers, and "perfect" circle framed sunglasses with reflective lenses. Victim 3 informed law enforcement that the Robber kept his hands in his sweatshirt pockets the entire time, even when the suspect raised his sweatshirt to show Victim 3 that he had a gun in his waistband. Victim 3 only saw the handle of the gun sticking out of the Robber's waistband and noticed it was army green in color.

25.     During the robbery, Victim 3 refused to give the Robber the arrow key. In doing so the Robber stated, "I don't want to hurt you." Victim 3 pleaded with the Robber to just let her do her job. Victim 3 began to get upset and the Robber stated "Don't get loud. I don't want anybody to hear you. I'll just go. I'll get another mail person. I'll just go for another mail person. Today's not you."

26.     Victim 3 stated when the Robber left, he got into the driver seat of the TARGET VEHICLE. Victim 3 described the TARGET VEHICLE as a newer style dark Grey Jeep Grand Cherokee. Victim 3 informed law enforcement that she believed the first 3 of the license plate were "301" or "30I" and the last 3 were letters, possibly containing an "A" or a "V." It should be noted that the TARGET VEHICLE has a Florida License plate of 30DANV.

27.     Later, Law Enforcement entered the known license plate for the TARGET VEHICLE, (30DANV), into the LPR program and discovered that the TARGET VEHICLE was captured on October 25, 2022, at 2:17 pm, at the intersection of USF Palm Drive and Fletcher Avenue, Tampa, Florida 33613. This intersection is approximately 22 minutes from the robbery location.

<u>TARGET VEHICLE Information</u>

28.     The TARGET VEHICLE is registered to R.C. at the SUBJECT PREMISES. Law Enforcement discovered that R.C. is the father of CAPERS. In a separate investigation local law enforcement, the Ocala Police Department, interviewed R.C. after the TARGET VEHICLE was captured on bank surveillance video associated with a fraudulent transaction regarding a stolen check. During the interview R.C. told local law enforcement that the TARGET VEHICLE is primarily driven by his son, CAPERS.

29.     Through this investigation, Law Enforcement learned that this vehicle was purchased through Drive Time, which is a company dealing in the sale of vehicles. Law Enforcement learned that this vehicle was equipped with a LoJack GPS tracking system which has been active on the vehicle since its purchase on or about July 2022.

<u>CAPERS' Cellular Phone – 352-812-5772</u>

30.     Through investigation and searches in Law Enforcement databases, investigators learned that CAPERS had provided a phone number of 352-812-5772 (TARGET TELEPHONE) during two previous encounters with local Law Enforcement. Records from AT&T show that R.C. has an active AT&T account and phone number 352-812-5772 associated to the TARGET TELEPHONE was one of the numbers that was associated to the account.

31.     A Historical Warrant, issued by a state judge, was sent to AT&T requesting the location for the TARGET TELEPHONE from October 1, 2022, through October 20, 2022. The location of the TARGET TELEPHONE associated to the phone number 352-812-5772 shows it being near the area at the time the robberies which occurred on October 4, 2022, and October 6, 2022.

32.     Specifically, AT&T records show the TARGET TELEPHONE at or near the location of the robbery which occurred on October 4, 2022, at 19:04 GMT at:

18:58  Distance from Robbery 985m
19:01  Distance from Robbery 985m
19:02  Distance from Robbery 985m
19:03  Distance from Robbery 985m
19:04  Approximate time of Robbery
19:06  Distance from Robbery 807m

19:07  Distance from Robbery 877m
19:08  Distance from Robbery 2.89km
19:11  Distance from Robbery 5.91km

(It should be noted that this is in GMT Time Zone and the location accuracy listed by AT&T stated it is likely better than 1000 meters)

33.    After the robbery occurred the TARGET TELEPHONE historical data shows the location of the TARGET TELEPHONE at 19:07 GMT near State Rd 50 and additional historical location data shows the vehicle shortly after leaving the area and traveling towards Ocala, FL. The chart below shows the approximate location of the phone before during and after the October 4, 2022, Robbery occurred.

| DATE | TIME (GMT) | LONGITUDE | LATITUDE | APPROX MAP LOCATION |
|------|-----------|-----------|----------|---------------------|
| 10/04/2022 | 18:58:03 | -81.458415 | 28.548 | N KIRKMAN RD ORLANDO,FL |
| 10/04/2022 | 18:58:37 | -81.467424 | 28.549449 | HWY 408 ORLANDO, FL |
| 10/04/2022 | 18:58:45 | -81.458415 | 28.548 | N KIRKMAN RD ORLANDO,FL |
| 10/04/2022 | 19:00:59 | -81.471384 | 28.552113 | W COLONIAL DR ORLANDO, FL |
| 10/04/2022 | 19:01:24 | -81.458415 | 28.548 | N KIRKMAN RD ORLANDO,FL |
| 10/04/2022 | 19:01:25 | -81-471384 | 28.552113 | W COLONIAL DR ORLANDO, FL |
| 10/04/2022 | 19:02:54 | -81.458415 | 28.548 | N KIRKMAN RD ORLANDO,FL |
| 10/04/2022 | 19:03:00 | -81.458415 | 28.548 | N KIRKMAN RD ORLANDO,FL |
| 10/04/2022 | 19:03:08 | -81.452106 | 28.55232 | W COLONIAL DR ORLANDO, FL |
| 10/04/2022 | 19:03:38 | -81.467424 | 28.549449 | HWY 408 ORLANDO, FL |
| 10/04/2022 | 19:06:14 | -81.467424 | 28.549449 | HWY 408 ORLANDO, FL |
| 10/04/2022 | 19:06:16 | -81.458415 | 28.548 | N KIRKMAN RD ORLANDO,FL |
| 10/04/2022 | 19:07:12 | -81.471384 | 28.552113 | W COLONIAL DR ORLANDO, FL |
| 10/04/2022 | 19:07:58 | -81.475695 | 28.548342 | HWY 408 |

13

| | | | | ORLANDO, FL |
|---|---|---|---|---|
| 10/04/2022 | 19:08:12 | -81.475695 | 28.548342 | HWY 408 ORLANDO, FL |
| 10/04/2022 | 19:08:46 | -81.475695 | 28.548342 | HWY 408 ORLANDO, FL |
| 10/04/2022 | 19:10:10 | -81.475695 | 28.548342 | HWY 408 ORLANDO, FL |
| 10/04/2022 | 19:11:22 | -81.520137 | 28.536795 | HWY 408 ORLANDO, FL |
| 10/04/2022 | 19:12:58 | -81.542349 | 28.54647 | FLORIDA TURNPIKE |

34.     AT&T records show the TARGET TELEPHONE associated with the phone number 352-812-5772 at or near the location of the robbery which occurred on October 6, 2022, at approximately 20:00 GMT at the following times:

19:58  Distance from Robbery 1.02km
20:00  Approximate Time of Robbery
20:03  Distance from Robbery 1.02km
20:06  Distance from Robbery 1.02km
20:07  Distance from Robbery 1.32km
20:08  Distance from Robbery 1.32km
20:09  Distance from Robbery 1.12km
20:10  Distance from Robbery 1.32km

(It should be noted that this is in GMT Time Zone and the location accuracy listed by AT&T stated it is likely better than 400 - 1500 meters)

35.     After the robbery occurred the TARGET TELEPHONE historical data shows the location of the phone at 20:07 GMT near State Road 50 in Orlando, FL. Additional location data shows the TARGET TELEPHONE shortly after (20:13 GMT) leaving the area and traveling towards Ocala, FL. The chart below shows the approximate location of the phone before during and after the Robbery occurred.

14

| DATE | TIME (GMT) | LONGITUDE | LATITUDE | APPROX MAP LOCATION |
|---|---|---|---|---|
| 10/06/2022 | 19:57:03 | -81.473769 | 28.574811 | ALTA VISTA APARTMENTS, ORLANDO, FL |
| 10/06/2022 | 19:57:15 | -81.471384 | 28.552113 | W COLONIAL DR ORLANDO, FL |
| 10/06/2022 | 19:57:44 | -81.473769 | 28.574811 | ALTA VISTA APARTMENTS, ORLANDO, FL |
| 10/06/2022 | 19:57:57 | -81.473769 | 28.574811 | ALTA VISTA APARTMENTS, ORLANDO, FL |
| 10/06/2022 | 19:58:07 | -81.473769 | 28.574811 | ALTA VISTA APARTMENTS, ORLANDO, FL |
| 10/06/2022 | 19:58:28 | -81.473769 | 28.574811 | ALTA VISTA APARTMENTS, ORLANDO, FL |
| 10/06/2022 | 19:58:29 | -81.470826 | 28.552086 | W COLONIAL DR ORLANDO, FL |
| 10/06/2022 | 20:00:47 | -81.470826 | 28.552086 | W COLONIAL DR ORLANDO, FL |
| 10/06/2022 | 20:03:07 | -81.470826 | 28.552086 | W COLONIAL DR ORLANDO, FL |
| 10/06/2022 | 20:06:54 | -81.470826 | 28.552086 | W COLONIAL DR ORLANDO, FL |
| 10/06/2022 | 20:07:23 | -81.458415 | 28.548 | N KIRKMAN RD ORLANDO, FL |
| 10/06/2022 | 20:07:51 | -81.458415 | 28.548 | N KIRKMAN RD ORLANDO, FL |
| 10/06/2022 | 20:08:31 | -81.458415 | 28.548 | N KIRKMAN RD ORLANDO, FL |
| 10/06/2022 | 20:09:02 | -81.467424 | 28.549449 | HWY 408 ORLANDO, FL |
| 10/06/2022 | 20:09:41 | -81.467424 | 28.549449 | HWY 408 ORLANDO, FL |
| 10/06/2022 | 20:09:56 | -81.467424 | 28.549449 | HWY 408 ORLANDO, FL |
| 10/06/2022 | 20:10:43 | -81.458415 | 28.548 | N KIRKMAN RD ORLANDO, FL |
| 10/06/2022 | 20:13:51 | -81.492246 | 28.570599 | APOPKA-VINELAND RD / SILVERSTAR RD ORLANDO, FL |
| 10/06/2022 | 20:13:57 | -81.502713 | 28.537596 | GOOD HOLMES RD ORLANDO, FL |
| 10/06/2022 | 20:14:06 | -81.475695 | 28.548342 | HWY 408 ORLANDO, FL |
| 10/06/2022 | 20:14:08 | -81.510048 | 28.54606 | HWY 408 ORLANDO, FL |
| 10/06/2022 | 20:14:58 | -81.511848 | 28.545012 | HWY 408 ORLANDO, FL |
| 10/06/2022 | 20:14:59 | -81.522189 | 28.540152 | HWY 408 / FL TURNPIKE RAMP |

15

| | | | | ORLANDO, FL |
|---|---|---|---|---|
| 10/06/2022 | 20:15:05 | -81.522189 | 28.540152 | HWY 408 / FL TURNPIKE RAMP ORLANDO, FL |
| 10/06/2022 | 20:17:02 | -81.542349 | 28.54647 | FLORIDA TURNPIKE |

## Historical LoJack Records

36.     During the investigation your affiant obtained records from

Spireon, Inc. owner of LoJack. Records from LoJack show that the TARGET

VEHICLE was located at 867 Paul St. Orlando, FL on October 4, 2022, at

3:01 pm. This location is approximately one block from the robbery location

which occurred at 911 North Nowell Street Orlando, FL 32808.

## Vehicle Tracker

37.     In October, the Orange County Sheriff's Office, through a Court

Order, applied a Tracking device on the TARGET VEHICLE after it was

identified as being associated with the robberies. Since the tracking device was

installed on or about November 7, 2022, law enforcement has monitored its

location. Law Enforcement noticed that the TARGET VEHICLE has been

parked overnight primarily at the SUBJECT PREMISES.

38.     Specifically, from November 7, 2022, through December 26,

2022 (a span of 49 Days) the TARGET VEHICLE had been parked at the

SUBJECT PREMISES overnight 39 of the 49 days. Based on my training and

experience I believe CAPERS resides at the SUBJECT PREMISES, and

evidence including his clothing worn at the time of the robbery as described above may be located inside the SUBJECT PREMISES.

### III.   COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

39.     As described above, and in Attachment B1, B2 and B3 to the search warrant for the SUBJECT PREMISES, the SUBJECT VEHICLE, and TARGET TELEPHONE this application seeks permission to search for records that might be found at the SUBJECT PREMISES and the SUBJECT VEHICLE, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

40.     *Probable Cause.* I submit that if a computer or storage medium is found at the SUBJECT PREMISES and the SUBJECT VEHICLE, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

> a)     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered

months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b)      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c)      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d)      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

41.     *Forensic Evidence.* As further described in Attachment B1, B2 and B3 to the search warrant for the SUBJECT PREMISES and the SUBJECT VEHICLE, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used,

18

the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any computer in the SUBJECT PREMISES and the SUBJECT VEHICLE because:

a) Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b) As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communication, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus,

19

spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

20

c)     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d)     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e)     Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f)     I know that when an individual uses a computer to obtain unauthorized access to a victim computer over the Internet or to use a computer to execute a scheme to defraud, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the

21

criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

42.     *Necessity of seizing or copying entire computers or storage media*. In most cases, a thorough search of a premise for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a)     The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b)     Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c)     Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

43.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit seizing or imaging storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant. The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

23

## IV.   **CONCLUSION**

44.    I submit that this affidavit supports probable cause for a warrant to search the SUBJECT PREMISES described in Attachment A1 and seize the items described in Attachment B1, the TARGET VEHICLE, described in Attachment A2 and seize the items described in Attachment B2, and the TARGET PHONE, described in Attachment A3 and seize the items described in Attachment B3.

45.    I further submit based on my training, experience, and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to obtain an arrest warrant for DARIUS CAPERS for violations of 18 U.S.C. §§ 2114(a) and 2114(b), Robbery of a Mail Carrier and Receiving or Possessing stolen USPS property.

This concludes my affidavit.

_____
Charles Johnsten
United States Postal Inspector

Affidavit submitted by email and attested to me
as true and accurate via telephone or video conference,
consistent with Fed. R. Crim. P. 4.1 and 4(d)(3), before me
this ___10___ day of January, 2023.

_____
DANIEL C. IRICK
UNITED STATES MAGISTRATE JUDGE

24

## ATTACHMENT A1

*Property to be Searched*

The property to be searched is: **5017 SW 97th PL, OCALA,**

**FLORIDA**, **34476** further described as a one-story home located on 97th Place

in Ocala, Florida. This single-family home has a Beige-colored stucco siding

and a tan and brown-colored roof. The residence is clearly marked 5017 on the

garage.



## ATTACHMENT B1

*Property to be Seized*

1.      All records relating to violations of 18 U.S.C. § 2114(a) (Robbery of a Mail Carrier) and 18 U.S.C. § 2114(b) (Receive or Possess stolen USPS property) including:

a.  Records and information relating to a scheme to steal or rob a mail carrier of an arrow key

b.  Records and information relating to the identity or location of the suspect(s);

c.  Records and information relating to any and all credit cards, debit cards, and/or gift cards obtained fraudulently or in the names or identities other than the tenants of the SUBJECT PREMISES;

d.  Records and information relating to any and all items that are evidence or indicia of the production, manufacture, distribution, storage, transportation, and uttering of counterfeit and/or fraudulently obtained credit or debit cards;

e.  Records and information relating to U.S. Mail or items addressed to individuals in names or identities other than the tenants of the SUBJECT PREMISES; and

f.  Records and information relating to the purchase/receipt of a product

from a compromised credit card, debit card and/or gift card.

g.  Any safes used to store valuables such as credit cards.

h.  Any and all paging devices and cellular telephones, digital or otherwise, and bills or receipts relating to the leasing/renting of the paging devices and cellular telephones.

i.  Bank statements, loan applications, wire transfer information, money drafts, letters of credit, money orders, cashier checks, bank checks, safe deposit box keys, vault keys, safes, and any and all documents relating to banking activities.

j.  Records and ledgers, storage facility documents, account books, notes, names and/or code names or nicknames, and/or identifying information reflecting customers and/or suppliers, amounts of counterfeit and/or fraudulently obtained credit cards, applied for, bought, sold or manufactured, and amounts of money, paid, owed or collected. Any and all receipts reflecting the use of any credit card, debit card, and/or gift card.

k.  Any and all appointment calendars.

l.  Any and all customer lists, other manufacturer or distributor lists, or any notes containing the individual names of such persons, telephone numbers and/or addresses of these customers, manufacturers, or

distributors, and any corresponding records of accounts receivable, money paid or received, counterfeit access devices or documents supplied or received, cash received to be paid or intended to be paid for counterfeit and/or fraudulently obtained access devices.

m. Telephone and address books or notes containing telephone numbers and addresses of co-conspirators or other such records or photographs which indicate a criminal association between co-conspirators. Any identification documents of individuals whose names have been associated with fraudulent access devices and/or fraudulent forwarding of U.S. Mail.

n. Vehicles registered to the occupants of the SUBJECT PREMISES, under the care, custody or control or on the property on which the SUBJECT PREMISES is situated, which may contain postal arrow keys, clothing, or cash used to facilitate illegal activity, or which is the proceeds of criminal activity.

## ATTACHMENT A2

*Property to be Searched*

The property to be searched (the "TARGET VEHICLE") further described as a Grey 2015 Chrysler Jeep Grand Cherokee bearing Florida license plate number 30DANV, and VIN 1C4RJEAG3FC826300.

**ATTACHMENT B2**

*Property to be Seized*

1.      All records relating to violations of 18 U.S.C. § 2114(a) (Robbery of a Mail Carrier) and 18 U.S.C. § 2114(b) (Receive or Possess stolen USPS property), including:

a. Records and information relating to a scheme to steal or rob a mail carrier of an arrow key

b. Records and information relating to the identity or location of the suspect(s);

c. Records and information relating to any and all credit cards, debit cards, and/or gift cards obtained fraudulently or in the names or identities other than the tenants of the TARGET VEHICLE;

d. Records and information relating to any and all items that are evidence or indicia of the production, manufacture, distribution, storage, transportation, and uttering of counterfeit and/or fraudulently obtained credit or debit cards;

e. Records and information relating to U.S. Mail or items addressed to individuals in names or identities other than the tenants of the TARGET VEHICLE; and

f. Records and information relating to the purchase/receipt of a product

from a compromised credit card, debit card and/or gift card.

g.  Any safes used to store valuables such as credit cards.

h.  Any and all paging devices and cellular telephones, digital or otherwise, and bills or receipts relating to the leasing/renting of the paging devices and cellular telephones.

i.  Bank statements, loan applications, wire transfer information, money drafts, letters of credit, money orders, cashier checks, bank checks, safe deposit box keys, vault keys, safes, and any and all documents relating to banking activities.

j.  Records and ledgers, storage facility documents, account books, notes, names and/or code names or nicknames, and/or identifying information reflecting customers and/or suppliers, amounts of counterfeit and/or fraudulently obtained credit cards, applied for, bought, sold or manufactured, and amounts of money, paid, owed or collected. Any and all receipts reflecting the use of any credit card, debit card, and/or gift card.

k.  Any and all appointment calendars.

l.  Any and all customer lists, other manufacturer or distributor lists, or any notes containing the individual names of such persons, telephone numbers and/or addresses of these customers, manufacturers, or

distributors, and any corresponding records of accounts receivable, money paid or received, counterfeit access devices or documents supplied or received, cash received to be paid or intended to be paid for counterfeit and/or fraudulently obtained access devices.

m. Telephone and address books or notes containing telephone numbers and addresses of co-conspirators or other such records or photographs which indicate a criminal association between co-conspirators. Any identification documents of individuals whose names have been associated with fraudulent access devices and/or fraudulent forwarding of U.S. Mail.

## **ATTACHMENT A3**

*Property to be Searched*

The property to be searched is: a cellular telephone assigned telephone number 352-812-5772 (the "TARGET TELEPHONE")

## ATTACHMENT B3

*Property to be Searched*

A.   **Particular Things to be Seized**

All records on the TARGET TELEPHONE described in Attachment

A3 that relate to violations of 18 U.S.C. § 2114(a) (Robbery of a Mail Carrier)

and 18 U.S.C. § 2114(b) (Receive or Possess stolen USPS property), including:

   a.  Records, communications, data, and materials relating to the theft of U.S. mail;

   b.  Records, communications, data and materials relating to the use or intended use of stolen mail;

   c.  Records, communications, data, and materials relating to the impersonation of U.S. individuals or businesses;

   d.  Records, communications, data, and materials relating to the unlawful acquisition and distribution of personal identifying information and financial records;

   e.  Records, communications, data, and materials relating to the identities of the persons who created or used digital devices or electronic accounts in connection with the theft of U.S. mail, including records that help reveal the whereabouts of such persons;

   f.  Records, communications, data, and materials discussing travel, both within the United States and internationally, for the purpose of stealing mail, and/or stealing and/or unlawfully using personal identifying information and financial records;

   g.  Records, communications, data, and materials containing attachment of media files, documents, or payment information related to the theft of U.S. mail;

h.  Records, communications, data, and materials documenting any steps undertaken in preparation for mail theft and the use of stolen mail, including but not limited to, setting up bank accounts, email accounts, phone numbers, or addresses (including post office boxes), registering businesses, and conducting bookkeeping;

i.  Records, communications, data, and materials including telephone call/text detail records (toll records), website or search history;

j.  Evidence of who used, owned, or controlled the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

k.  Evidence of software that would allow others to control the Device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

l.  evidence of the lack of such malicious software;

m. evidence indicating how and when the Device was accessed or used to determine the chronological context of access, use, and events relating to crime under investigation and to the Device user;

n.  evidence indicating the Device user's state of mind as it relates to the crime under investigation;

o.  evidence of the attachment to the Device of other storage devices or similar containers for electronic evidence;

p.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device;

2

q.  evidence of the times and locations the Device was used;

r.  passwords, encryption keys, and other access devices that may be necessary to access the Device;

s.  documentation and manuals that may be necessary to access the Device or to conduct a forensic examination of the Device;

t.  records of or information about Internet Protocol addresses used by the Device;

u.  records of or information about the Device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

v.  contextual information necessary to understand the evidence described in this attachment;

w.  evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.